# UNITED STATES DISTRICT COURT

for the

District of Columbia

**FILED**

DEC 1 7 2018

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

4215 FOOTE STREET NE,
WASHINGTON, D.C. 20019
(TARGET LOCATION)

)
)
)
)
)
)

Case No. 18-sw-341

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A incorporated herein.

located in the _____ District of _____Columbia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841(a)(1) | PWID Controlled Substances |
| 21 U.S.C. Section 846 | Conspiracy |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Richard Migliara, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/17/2018

_____
*Judge's signature*

City and state: Washington, DC

Robin M. Meriweather, Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>4215 FOOTE STREET NE,<br>WASHINGTON, D.C. 20019<br>(TARGET LOCATION) | )<br>)<br>)<br>)  Case No. 18-sw-341<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ Columbia *(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before     December 28, 2018     *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Robin M. Meriweather
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____

Date and time issued:     12/17/2018  @3:05pm                    *Judge's signature*

City and state:     Washington, DC                    Robin M. Meriweather, Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-1 ("TARGET LOCATION 1")

*Property to Be Searched*

### 4215 Foote Street Northeast, Washington, D.C. 20019

4215 Foote Street Northeast, Washington, D.C. 20019 is a two story brick duplex structure which faces north on Foote Street Northeast, between 42nd and 44th Streets Northeast. As viewed from Foote Street, the residence is on the right side of the duplex structure. The residence is painted a light grayish white color, and has black shutters on the three visible windows (two second level windows, and one main level window) on its front side. Utility meters are visible to the right of the front door. There is a left-swing outer storm door with a window and an inner door on the front side of the structure.

The side and rear yard are blocked form view by a six-foot wooden shadow box style fence, which has an access gate.

On the residence's rear side, which is accessible via service alley, there is a concrete driveway and a shed structure. The rear access to the structure has a black metal lock-out out-swing security door, and a white inner door. Raw, red, unfinished bricks are visible at the top right of the rear door. One window is visible on the main level, and two windows are visible on the second level.

**ATTACHMENT B**

*Property to Be Seized*

The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of: possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit such offense, in violation of 21 U.S.C. § 846 (collectively, the "TARGET OFFENSES"), as described in the search warrant affidavit, including, but not limited to:

1.    Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, packaging of illegal narcotics substances, and also including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents, which is evidence of the TARGET OFFENSES.

2.    Items used in the manufacture or cooking of heroin and cocaine, including precursor chemicals, chemistry guides, glassware and flasks, which is evidence of the TARGET OFFENSES.

3.    Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition, ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including, but not limited to, gun-cleaning kits, gun-sights, holsters, receipts and documentation for the purchased of same, and related firearm paraphernalia, which constitute tools for the commission of the TARGET OFFENSES.

4.    Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records, which is evidence of the TARGET OFFENSES, proceeds of the TARGET OFFENSES, and contain evidence of the TARGET OFFENSES.

5.    Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances and the transportation, ordering, purchase and transfer of firearms and ammunition, which is evidence of the TARGET OFFENSES.

6.    Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of violations of the TARGET OFFENSES.

7.    Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items

evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money, which constitute records and proceeds of the TARGET OFFENSES.

8.    United States currency, precious metals, jewelry and financial instruments, stocks and bonds, which constitute proceeds of the TARGET OFFENSES.

9.    Photographs, in particular photographs of coconspirators, assets, firearms, and controlled substances, which constitute evidence of the TARGET OFFENSES.

10.    Cellular telephones, cameras, computers, laptops, iPads, DVDs, hard drives, and electronic store devices, and receipts reflecting their ownership and use, which contain records of the commission of the TARGET OFFENSES.

11.    Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES or proceeds from the commission of the TARGET OFFENSES; and

12.    Indicia of ownership, including, receipts, invoices, bills, canceled envelopes and keys, which provides evidence of identity as to individuals committing the TARGET OFFENSES.

**FILED**

**DEC 1 7 2018**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**IN THE MATTER OF THE SEARCH OF:**

**4215 FOOTE STREET NE,
WASHINGTON, D.C. 20019
(TARGET LOCATION)**

CASE NO. $18-sw-341$

**FILED UNDER SEAL**

### AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANT

Your affiant, Richard A. Migliara, Special Agent with the Federal Bureau of Investigation

(hereinafter "FBI"), Washington Field Office (hereinafter "WFO"), Washington, D.C. (hereinafter

"affiant"), being duly sworn, deposes, and states as follows:

### I.     AFFIANT'S BACKGROUND, EXPERIENCE, AND KNOWLEDGE

1.     I am an investigative or law enforcement officer of the United States within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations and to make arrests for offenses enumerated

in 18 U.S.C. § 2516.

2.     Your affiant is a sworn Special Agent with the FBI, United States Department of

Justice, and has served in that capacity since June of 2017, when your affiant was assigned to the

FBI's Washington Field Office, serving on a drug and violent crime squad. Your affiant is

currently assigned to the Safe Streets Task Force ("SSTF"), which conducts investigations relating

to, among other things, narcotics violations. Your affiant has prior experience as an FBI analyst,

from February 2010 to January 2017. I have received training and experience in interviewing and

interrogation techniques, arrest procedures, search and seizure, search warrant applications, and

narcotics, white-collar crimes, and various other crimes. In the course of my training and

experience, I have become familiar with the methods and techniques associated with the

distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen registers and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

3. Through instruction and participation in investigations, I have become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms that traffickers use to disguise conversations about their narcotics activities. From my training and experience, I have learned, among other things, that narcotics traffickers frequently use cellular telephones to further their illegal activities in the belief that, by so doing, they can avoid detection and thwart the efforts of law enforcement. Cellular telephones also enable coconspirators to remain in constant or ready communication with one another without restricting either party to a particular geographic location, thus hampering surveillance by law enforcement authorities. Furthermore, narcotics traffickers usually do not expressly refer to cocaine, heroin, phencyclidine ("PCP"), or other controlled substances by name, and when they do so, it is most often by mistake. Instead, they routinely refer to drugs and drug quantities — and also quantities of cash — by using code words and/or seemingly innocuous words or phrases in an effort to conceal the true nature of their illegal activities and thwart detection by law enforcement. Narcotics traffickers also frequently have access to several cellular telephones and telephone numbers, and they periodically use newly acquired cellular telephones and telephone numbers, or frequently

2

change cellular telephones and telephone numbers, to avoid detection while attempting to thwart apprehension by law enforcement. In order to avoid law enforcement detection, these cellular telephones are often prepaid cellular telephones that are often not registered or subscribed to in the purchaser's or primary user's name and are instead often registered in a false name and/or to a false address.

4.    Based on your affiant's knowledge, training, experience and participation in numerous other investigations involving cocaine base, powder cocaine, heroin, marijuana, and other controlled dangerous substances, your affiant also knows that:

(a)    Narcotics traffickers keep narcotics, narcotics-related items and paraphernalia, money, firearms, and firearm-related items in their residences, and/or their vehicles, and/or stash/storage locations, such as other apartments, garages, sheds and storage lockers. In addition, in a conspiracy involved in the distribution and possession with intent to distribute cocaine base, powder cocaine, heroin, or marijuana, these locations may also contain apparently innocuous materials that are used for specific purposes in the drug trade. For example, small and large plastic baggies are the packaging material of choice for many narcotics; scales are often used to ensure the quantities are commensurate with price, as well as to determine as accurately as possible the varying amounts of the drugs being sold; microwave ovens, pots, dishes, false bottom containers and other containers, cooking utensils, and cutting agents are often used to "cook" powder cocaine into cocaine base, or to mix and dilute heroin, and transport it discreetly thereafter.

(b)    It is also common for narcotics traffickers to distribute from specific locations other than their own residences, to include stash houses, the residences of family members and associates, both witting and sometimes unwitting, and other locations where trusted associates of the trafficker are allowed access, in order to protect the cache of drugs, as well as the drug proceeds

3

derived from the sale of these drugs. Such locations provide security for the trafficker, and it is a known location where customers go to obtain drugs.

(c)     Drug traffickers often use and retain firearms and other weapons to protect themselves, as well as to secure their cache of narcotics. Individuals who possess and store firearms in their residences, vehicles and/or stash locations, or in the residences of trusted associates, often also store ammunition, shell casings, slugs, targets, holsters, gun cleaning kits, and ownership papers.

(d)     Narcotics traffickers may also keep records of their trafficking activities to ensure they receive payment for the narcotics their customers purchase. These records may be in written or electronic form. Narcotics traffickers also often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, numerous business cards, photographs, address and telephone number books and papers, and other documentation relating to the transportation, ordering, sale and distribution of controlled substances, and contact information for associates and coconspirators in the narcotics trade. This documentary evidence may include credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking. These items are generally maintained and retained for long periods of time in the drug traffickers' residences or the residences of a relative or associate where the drug dealer can quickly and easily access them and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated. It also is common to maintain and store the aforementioned evidence of narcotics trafficking crimes on electronic storage devices, including computers, mobile or cellular

4

telephones, personal digital assistants (PDAs), handheld computers, MP3 players, digital hard drives, including, but not limited to, iPods and external storage drives; and the media to store information, including diskettes, tapes or data storage devices.

(e) Individuals involved in narcotics trafficking often conceal within their residences, the residences of family members, friends and associates, the places of operation of the drug distribution activity such as stash houses or safe houses, or in business locations with which the traffickers are associated, large amounts of currency, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking within their residences, offices and businesses, garages, storage buildings, automobiles, and safety deposit boxes. Additionally, it is a common practice for drug dealers to utilize safes within their residences, or the residence of a confidante, relative or associate, in an effort to safeguard, and more importantly conceal, such proceeds of their drug trafficking.

## II.  REQUESTED SEARCH WARRANT

5.  As part of your affiant's current assignment, your affiant and others have been investigating a narcotics trafficking organization that has been distributing narcotics in the District of Columbia and the District of Maryland that involves organization members that are both known and unknown (the "Target Subjects").

6.  I submit, pursuant to the facts set forth in this Affidavit, that there is probable cause to believe that evidence, fruits, or instrumentalities of violations of possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); and conspiracy to commit such offenses, in violation of 21 U.S.C. § 846, will be found at the TARGET

LOCATION as follows: 4215 Foote Street, Northeast, Washington, D.C. 20019 ("TARGET LOCATION");

7.       This affidavit is based, in part, upon information provided to your affiant by other special agents of the FBI, special agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), Task Force Officers of the FBI, physical surveillance, a confidential source, and other information gathered during the course of this investigation. Since this affidavit is being submitted for the limited purpose of securing authorization for the search of the above-cited Target Locations and Target Vehicles, your affiant has not included each and every fact known to your affiant concerning this investigation. Your affiant has set forth only the facts that your affiant believes are necessary to establish probable cause for the issuance of the search warrants requested herein. Along those lines, the Court should note that while there is reference made in this affidavit to intercepted telephone conversations, only a sampling of pertinent calls are summarized in the document. This is for illustrative purposes, and is by no means an exhaustive list or recitation of the relevant conversations that were intercepted.

## III.    PROBABLE CAUSE

### Initial Background of Investigation (Narcotics Conspiracy)

8.       In July of 2018, agents associated with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Federal Bureau of Investigation, and the Metropolitan Police Department ("MPD") began investigating                                   for possible criminal offenses involving the illegal sale of firearms and narcotics. In addition to using GPS-tracking search warrants, pen registers, and other investigatory techniques, the agents also utilized an undercover special agent ("UC") to further the investigation.

6



9.      On August 6, 2018, a UC with the ATF engaged in a controlled purchase with ▮▮▮▮▮ ▮▮▮▮▮ Specifically, the UC—who had been previously introduced to ▮▮▮▮▮ weeks before—told ▮▮▮▮▮ that he was interested in purchasing marijuana and firearms from ▮▮▮▮▮ The UC communicated with ▮▮▮▮▮ via text message. ▮▮▮▮▮ indicated that he could provide the UC with a firearm with a magazine, an extended magazine, an attached silencer, in exchange for $1,400. Additionally, ▮▮▮▮▮ could provide the UC with different flavors of "gas," a.k.a. marijuana, in exchange for $1,600 to $1,800. After several text message conversations regarding the type of firearm being sold as well as the prices for the different guns and parts, the two finally agreed to meet on August 6, 2018. On that date, after additional negotiation over the prices, the two met. At the request of ▮▮▮▮▮ the UC traveled to the Home Depot parking lot located at 901 Rhode Island Avenue, Northeast, Washington, D.C. At approximately 6:58 p.m., ▮▮▮▮▮ arrived in the parking lot and entered the UC's unmarked vehicle. ▮▮▮▮▮, who had a backpack on his person, placed the backpack on the front passenger floorboard in front of his feet, and pulled out: one clear vacuum sealed plastic bag containing half a kilogram of green plant-like substance (which ▮▮▮▮▮ identified as lemon tree flavored marijuana), one unloaded Mack 11 9 mm handgun, one extended magazine, and one regular magazine ▮▮▮▮▮ explained that his firearms source forgot to provide him the silencer previously discussed and that ▮▮▮▮▮ would bring the silencer to the next firearms transaction that he conducted with the UC. In exchange for the marijuana, the firearm, and its accessories, the UC gave ▮▮▮▮▮ a total of $3,000 U.S. Currency. ▮▮▮▮▮ exited the vehicle and left the area on foot.

7

10.     Approximately two weeks later, on August 20, 2018, the same UC conducted another controlled purchase with ███ at the same location. After the August 6, 2018 buy, ███ and the UC continued conversing via text message about the future purchase of additional narcotics and firearms. ███ texted the UC several photographs of firearms he was looking to sell, including a fully automatic pistol. ███ explained that he was not sure how long his gun supplier would hold onto the firearms before ███ had to sell them, so ███ would keep the UC updated as to when they could meet and conduct another transaction. In the lead-up to August 20, 2018, ███ and the UC texted each other and negotiated over the type of firearms, the price of firearms, the price of marijuana, and the logistics of any future transaction. After much discussion, the two agreed to meet on August 20, 2018. On that date, at approximately 7 p.m., the UC drove to the parking lot at 901 Rhode Island Avenue Northeast and parked. ███ entered the UC's vehicle, this time holding a big black duffle bag. Once inside of the vehicle, ███ pulled out: one pound of "Pineapple" marijuana, one pound of "Venom OG" marijuana, one plastic shopping bag full of various ammunition, one silencer, one Sig Sauer pistol with an extended magazine, a Draco AK-47 pistol with a magazine, and one AR-15 rifle with multiple magazines. In exchange, the UC gave $7,600 in U.S. currency.

11.     Over the next few months, the UC continued conversing with ███ This time, however, the conversation shifted from the purchase of marijuana and firearms to the purchase of heroin and firearms. Specifically, the UC inquired about purchasing 125 grams of heroin from ███ explained that his heroin supplier had completely pure heroin, so much so that the fumes associated with the heroin would cause individuals to vomit.

8

███████████ encouraged the UC to use cutting agents to dilute the good-quality heroin, in order to make a future profit.

12. On or about November 1, 2018, ███████████ and the UC met to conduct a transaction. After some initial phone and text conversations, the two agreed to meet at the Wendy's parking lot located at 4250 Nannie Helen Burroughs Avenue Northeast, Washington, D.C. At approximately 2:58 p.m., the UC arrived at the parking lot, and observed ███████████ standing next to a silver Nissan four-door sedan. ███████████ entered the UC's vehicle. ███████████ explained that he was waiting for the heroin to arrive within five minutes from his supplier, but that he had the firearm they had discussed inside of his vehicle. ███████████ retrieved the firearm, returned to the UC's vehicle, and gave the firearm to the UC in exchange for $700 in pre-recorded agent cashier funds. The UC continued to wait for the heroin, but because it was taking too long, the UC told ███████████ that he would leave. ███████████ stepped out of the vehicle to call his heroin supplier (he referred to him as his "OG") to find out when the heroin would arrive. ███████████ explained that his OG was not the person dropping off the heroin, but rather a subordinate of OG who would drop off the heroin. At approximately 3:30 p.m., after waiting for a period of time without the heroin's arrival, the UC left the parking lot without the heroin.

13. Minutes later, ███████████ called the UC back. ███████████ explained that the heroin had finally been delivered to him, was available for pick-up, and he apologized for the long wait. The UC drove back to the parking lot at approximately 4:31 p.m., and ███████████ provided the UC with approximately 131 grams of heroin in exchange for $10,800 in pre-recorded agent cashier funds. The heroin was later field-tested and came back positive for the presence of opiates.

9

14.    On November 29, 2018, ███████████ and the UC met again in order to conduct another transaction, similar to the November 1, 2018 transaction. Prior to the controlled purchase, around 12:00 p.m., ███████████ indicated that he first had to pick up the heroin from his supplier before meeting with the UC. Notably, ███████████ explained that he would first have to get picked up by his driver, who would then drive him to meet his supplier. After some initial phone and text conversations, the two agreed to meet at the parking lot located at 1535 Alabama Avenue Southeast, Washington, D.C. 20032, sometime after 2:00 p.m. At approximately 2:55 p.m., both the UC and ███████████ arrived at the parking lot. ███████████ exited a black Mercedes sedan and retrieved a small black duffle bag from the trunk of the Mercedes. ███████████ then walked to the UC's vehicle and sat down in the front passenger seat. ███████████ immediately insisted that the UC move his vehicle to another location in the parking lot, because he had concerns that law enforcement was present in the area. ███████████ nevertheless provided the UC a clear plastic baggie filled with large chunks of suspected heroin, as well as two revolvers and one Glock pistol. In exchange, the UC gave ███████████ $10,300 in pre-recorded funds. The heroin was later field-tested and came back positive for the presence of opiates. It weighed approximately 129 grams. The following day, November 30, 2018, ███████████ and the UC spoke over the telephone. ███████████ explained that he was suspicious the day before because of the presence of law enforcement in the parking lot where they had conducted the transaction and no longer wanted to use that parking lot for transactions. ███████████ explained that if he were to get in trouble with law enforcement, he vowed to remain silent and would let his lawyer do the talking for him. ███████████ indicated that his supplier remained interested in conducting future transactions.

10

15.     To summarize, between August 6, 2018 and November 29, 2018, ███████

personally sold eight firearms, approximately 1.5 kilograms of marijuana, approximately 260 grams of heroin, several firearms magazines, and other firearms accessories, to an undercover federal agent. All of the transactions were either audio or video-recorded and surveilled by other federal agents. All of the funds provided to ███████ were pre-recorded cashier funds. Moreover, all of the text messages exchanged between the two—using a cell phone app that intentionally deletes messages after a period of time—were, if available, photographed.

## Connection of Conspiracy to TARGET LOCATION

16.     Before the November 29, 2018 controlled purchase (*supra*), law enforcement first surveilled ███████ trying to ascertain the identity of his heroin supplier. Beginning at approximately 1:00 p.m., surveillance began at ███ Fairfax, Virginia ███████ known residence at the time). Approximately 20 minutes later ███████ pulled into the apartment complex parking lot next to ███ efferson Oaks Court, driving a 1998 white Toyota Camry bearing Virginia tag ███ and exited the vehicle before walking up the exterior stairway of ███ . At approximately 1:25 p.m., ███████ walked back down the exterior stairway of ███ carrying a black bag. ███████ walked directly to a 2014 black Mercedes 4-door sedan bearing Virginia tag ███ . The Mercedes bore "for hire" markings, which appeared consistent with vehicles used for sedan or taxi services. ███████ put the black bag in the trunk of the Mercedes before getting into the rear passenger seat of the vehicle and left the area in the Mercedes. This is consistent with ███████ s statement to the UC that he needed to get picked up by his driver and then meet his heroin supplier.

11

17.   Law enforcement maintained surveillance of the Mercedes as it proceeded from Fairfax, VA to Clinton, MD. At approximately 2:05 p.m., the Mercedes pulled into the parking lot of the Hip Hop Fish and Chicken located at 7600 Old Branch Avenue, Clinton, Maryland. █████████ exited the Mercedes and walked into the Hip Hop Fish and Chicken restaurant. At approximately 2:08 p.m., an individual later identified as Linwood THORNE, (DOB: █████████) exited Dou Perfect Auto Repair & Detailing ("Dou Perfect"), located at 7605 Barbara Lane, Suite B, Clinton, MD, driving a dark gray Jeep Grand Cherokee bearing VA dealer tag █████, registered to Cee Tees Auto Spa at 2776 S. Arlington Drive, Suite 207, Arlington, VA. THORNE drove off in the Jeep in the direction of the Hip Hop Fish and Chicken where █████████ had stopped. At 2:12 p.m., THORNE pulled into the parking lot of the Hip Hop Fish and Chicken and parked his Jeep. █████████ had previously told the UC – back in September of 2018 – that his heroin supplier was a millionaire who owned a mechanic shop, auto body shop, and a small car dealership.

18.   At approximately 2:15 p.m., THORNE entered the restaurant and met with █████████ who had been waiting inside of the restaurant. Shortly after, THORNE and █████████ walked out of the Hip Hop Fish and Chicken together. THORNE entered the driver's seat of his Jeep and █████████ got into the front passenger of the Jeep. At approximately 2:20 p.m., the Jeep drove out of the parking lot with the Mercedes following it. The Jeep and the Mercedes relocated to the rear of Mid-Atlantic Crab & Seafood located at 6210 Coventry Way, Clinton MD (across the street). █████████ exited the Jeep and opened the rear passenger door of the Mercedes before briefly going back to the Jeep to meet with THORNE, who remained seated in the Jeep.

12

19. At approximately 2:23 p.m., THORNE drove out of the area towards Dou Perfect Auto Repair & Detailing while ███████████ entered the rear passenger seat of the Mercedes, which also drove out of the area. Approximately three minutes later, at 2:26 p.m., THORNE arrived back at the Dou Perfect where THORNE parked his Jeep. Surveillance was terminated on THORNE at that time.

20. Law enforcement surveilled ███████████'s Mercedes from Clinton, MD. The vehicle immediately proceeded to the controlled purchase location, where ███████████ conducted the illegal narcotics and firearms transaction with the UC.

21. Law enforcement not only surveilled ███████████ on the dates of the controlled purchases, but also reviewed the pen register installed on ███████████'s cell phone. On November 1, 2018, the pen register revealed that immediately prior to the first heroin buy—November 1, 2018—███████████ was in contact with a telephone number (301) ██-██. In fact, ███████████ was in contact with that number on several occasions in the same time frame (approximately 12:30 p.m. to 3:30 p.m.) as when ███████████ told the UC that he was trying to ascertain the whereabouts of his incoming heroin. Law enforcement searched the telephone number through their databases, including ACCURINT, and learned that the telephone number (301) ████ was the listed business contact number for Dou Pefect.[1] Law enforcement further learned that the number subscribed to an individual named "Haywood Johnson" at 3101 34th Street Northeast, Washington, D.C. 20018. Based on your affiant's training and experience, your affiant knows that narcotics traffickers often use fake names when obtaining telephone numbers for new cell phones. Law enforcement, based on its investigation, could not find a person named Haywood

---

[1] The listed business contact number for Dou Perfect is (301) ████. A public internet search of Dou Perfect provides a different contact number.

13

Johnson related to Dou Perfect in any way. Moreover, the address of 3101 34th Street Northeast is not even a real address. The reason that law enforcement surveilled Dou Perfect on November 29, 2018 was because of the pen register's data, putting                    in contact with a number associated with the business. It was then, on November 29, 2018, that law enforcement, as described *supra*, observed                  and THORNE meet after THORNE left Dou Perfect. After the meet-up, THORNE then returned immediately back to Dou Perfect.

22.     In addition,                  had previously told the UC – back in September of 2018 – that his heroin supplier was a millionaire who owned a mechanic shop, auto body shop, and a small car dealership. At the time your affiant drafted this affidavit, law enforcement could not identify an owner of Dou Perfect business.

23.     Based on your affiant's training and experience, it is your affiant's belief that THORNE is the user of number 301-            and that the name "Haywood Johnson" and address on 34th Street N.E., Washington, D.C. were fabricated by THORNE to evade detection by law enforcement. Public source research (utilities and mail service records) on the address at 3101 34th Street N.E., Washington, D.C. 20018 did not reveal any connection to the name "Haywood Johnson." This is a common practice among narcotics distributors, to use fictitious names and addresses to aide in eluding law enforcement. Your affiant believes that                  and THORNE met at the Hip Hop Chicken and Fish and the Mid-Atlantic Crab and Seafood restaurants so that THORNE could supply            with the heroin, which          then sold (along with the firearms) to the UC minutes later. It is common for narcotics and firearms traffickers to seek resupply for large orders immediately before a transaction so they are not responsible for transporting large quantities of narcotics for an extended period of time. This is

14

done both to minimize the risk of robbery and to avoid detection and/or apprehension by law enforcement.

24. A flight manifest records request for THORNE showed that he traveled by air out of Dulles International Airport, in Dulles Virginia, on October 16, 2018. The flight reservation number showed two tickets were purchased. Accompanying THORNE on this flight was ▇▇▇. Public records checks indicated that ▇▇▇ is a resident of 4215 Foote Street Northeast, Washington, D.C. 20019. The same public records database also listed THORNE as a resident at the same address. This corroborates a conversation between ▇▇▇ and the UC on November 29, 2018, where ▇▇▇ stated that his heroin supplier recently traveled with his "wife."

25. On December 7, 2018, law enforcement surveilled 4215 Foote Street Northeast, Washington, D.C. 20019. At approximately 9:20 p.m., law enforcement located the same Jeep driven by THORNE on November 29, 2018, parked directly behind 4215 Foote Street Northeast. The vehicle was backed in, thereby hiding the rear license plate from initial plain view. At approximately 10:05 a.m., THORNE, wearing the same sweatshirt as previously worn by THORNE on November 29, 2018, exited the front door of 4215 Foote Street Northeast, Washington, D.C. Moments later, THRONE drove out of the alley in the same Jeep he had previously operated, and left the area.

26. On December 11, 2018, at approximately 10:00 a.m., law enforcement again observed THORNE exiting the front door of 4215 Foote Street Northeast. THORNE walked to the rear of the residence through a wooden fence. Moments later, THRONE drove out of the alley in a 2015 Chevrolet SUV with Maryland Tag 3DC7016 (registered to ▇▇▇ ▇▇▇ Old Alexandria Ferry Road, Clinton, MD). Law enforcement followed THORNE to the Citgo

15

fuel station at 3820 Minnesota Avenue Northeast, Washington, D.C., where he was observed standing next to his vehicle at the gasoline pumps. THORNE was observed reentering his vehicle, and driving back in the direction of Benning Road along Minnesota Avenue NE, where he began making erratic maneuvers, including parking at the Safeway supermarket at 322 40th Street Northeast, Washington, D.C. 20019 for approximately thirty seconds before leaving the lot again, without ever having exited the vehicle. In your affiant's experience, THORNE's behavior was consistent with counter surveillance activities, meaning THORNE was purposefully attempting to detect and deter any possible law enforcement agents from surveilling him. This is a common practice among narcotics traffickers.

27. Based on your affiant's training and experience, and information gathered during this investigation, your affiant believes that THORNE resides at the TARGET LOCATION with his significant other,          . In your affiant's experience, it is common for narcotics distributors to stash drugs and other contraband in multiple sites and residences, including residences of family members to avoid detection by law enforcement.

## V.   CONCLUSION

28. Based on the foregoing, I submit that there is probable cause to believe that evidence and instrumentalities of the crimes described herein and as set forth more fully in Attachment B to each warrant application, incorporated herein by reference, are contained or secreted within the confines of the TARGET LOCATION, as described more fully in Attachment A. It is also respectfully requested that this Court issue an order sealing, until execution of the warrant, all papers submitted in support of these warrants application, including the applications and search warrants. Your affiant believes that sealing this document is necessary because the warrants are relevant to an ongoing investigation and public disclosure of the documents could

result in the destruction of evidence and evasion of law enforcement by the targets. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Richard A. Migliara, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 21 day of December, 2018.

THE HONORABLE XXXXXXXXXXX
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA

Robin M. Meriweather
U.S. Magistrate Judge

17